# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:08CV202-RJC-DSC

| | |
|---|---|
| LETITIA WHITAKER AND )<br>JEFFERY WHITAKER as Next )<br>Friends of MARCUS WHITAKER,)<br>A Minor, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA,)<br>)<br>Defendant. )<br>) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the "Defendant's Motion and Memorandum for MRI Examination of Marcus Whitaker ..." (document #16) filed May 29, 2009, and "Supplement ..." (document #19) filed June 2, 2009; and the "Plaintiffs' Brief in Opposition ... " (document #20) filed June 15, 2009. On June 18, 2009, the Defendant filed its "Reply ... " (document #21).

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and the subject Motion is now ripe for the Court's consideration.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendant's Motion, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is an action to recover compensatory damages for alleged medical malpractice for failure to diagnose and treat hydrocephalus in an infant, Marcus Whitaker, who was born February 17, 2005. Marcus' father was serving in the Air Force at the time. From birth until his father's honorable

discharge in May 2005, Marcus was under the care and treatment of the medical staff at Eglin Air Force Base in Fort Walton Beach, Florida. This care and treatment included "well-baby" visits on March 1, 2005 and April 29, 2005. After his father left the service, Marcus was seen in Charlotte by a pediatrician, Dr. Andrew Gunter on August 3, 2005, who immediately referred Marcus for a CT Scan. Marcus was diagnosed with hydrocephalus and underwent immediate surgery for shunt placement by a neurosurgeon, Dr. Charles Scott McLanahan. Since that time, Marcus has been under regular treatment by Dr. Gunter, Dr. McLanahan, a neurologist, ophthalmologists, speech therapists, occupational therapists, and physical therapists.

According to Dr. Harvey Cantor, Plaintiffs' expert pediatric neurologist, "Marcus's current deficits include significant cognitive impairments, significantly delayed expressed and receptive language, and impairments of gross and fine motor movements." Expert Disclosure of Dr. Cantor, at 3, attached as Exhibit B to "Plaintiffs' Brief in Opposition ... " (document #20). These impairments are expected to last Marcus's entire life, which should not be shortened by these difficulties. Id. Marcus is expected to "require considerable medical and support services throughout his life, including custodial care." Id. "Additionally, it is very unlikely that he will be able to be competitively employed, and may, at best, be limited in his work opportunities to situations such as those provided in sheltered workshops." Id. The severity of Marcus' deficits, his inability to function independently, and his permanent need for care and treatment, have not been contested in this case.

On May 2, 2008, and after exhausting their administrative remedies, Plaintiffs filed their Complaint on behalf of Marcus, who is their son. The Complaint states a negligence claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and seeks in excess of $100,000 in damages.

2

On May 29, 2008, the Defendant filed its "Motion and Memorandum for MRI Examination of Marcus Whitaker ..." (document #16). Defendant seeks to have an MRI examination of Marcus's head and brain that would be conducted while Marcus was sedated under general anesthesia. The purpose of the MRI would be to determine whether Marcus "suffers from a congenital brain abnormality which may be causing, in whole or in part, his developmental and physical deficits, to wit: Dandy Walker Syndrome (DWS)." Id. at 2.

Defendant's Motion was premised on the expectation that Dr. Ben Renfroe, Defendant's expert pediatric neurologist, would testify that "it is more probable than not that, due to DWS, the outcome would have been the same even if the hydrocephalus was discovered [promptly]." Defendant's "Supplement ..." at 1 (document #19). As the Defendant now concedes in its Supplement, Dr. Renfroe testified instead that "he does not know what [Marcus's] outcome would have been and that he believes that no one can tell where [Marcus] would be [developmentally] if we would have shunted him early." Id. at 2. In other words, Defendant's only expert has disavowed the concept that DWS, if present, would have caused Marcus's admitted delays and deficits regardless of the Defendant's alleged negligence in treating his hydrocephalus.

Related to the subject Motion, in addition to Dr. Renfroe, four doctors have testified in this matter: Dr. McLanahan (treating neurosurgeon), Dr. Gunter (treating pediatrician), Dr. Daniel Rauch (Plaintiffs' expert pediatrician), and Dr. Cantor (Plaintiffs' expert pediatric neurologist).

During the course of his treatment, Marcus has received nine CT Scans (the most recent of which was 12/22/2008), all of his head, and two (2) cranial ultrasounds. In the voluminous medical record (which is hundreds of pages in length), the term "Dandy Walker Variant" appears only twice. First, one radiologist stated that a CT Scan taken in December 2005 "suggests Dandy Walker

3

variant,"[1] and Dr. McLanahan interpreted a CT Scan in September 2007 as presenting "evidence of what may be a Dandy Walker variant in the posterior fossa." In neither case did Marcus's treatment change, nor were follow up studies ordered to determine whether Marcus, in fact, suffered Dandy Walker variant as well as hydrocephalus. To the contrary, Dr. McLanahan determined that the possibility of Dandy Walker variant is irrelevant to Marcus' treatment. See Deposition Excerpts of Dr. McLanahan at 26-28, attached as Exhibit A to "Plaintiffs' Brief in Opposition ... " (document #20).

Moreover, at his deposition Dr. McLanahan was questioned about the propriety of an MRI for Marcus. He responded that MRI scans "are very noisy and it's a very scary experience for a [then] three year old, as you might imagine, so it's just not practical." Id. at 42. He further explained that whereas CT scans do not require general anesthetic for a young child, an MRI scan does because "[h]e would be in a claustrophobic environment and for that circumstance I don't think we would get away with just doing mild sedation ... it's a general anesthetic. We don't like to put any child under a general anesthetic unless we think the information is valuable." Id. at 41-42. When asked whether an "MRI would give you a definitive diagnosis of Dandy Walker," Dr. McLanahan responded, "[n]ot necessarily." Id. at 42.

The issue was revisited later in the deposition:

Q. What could happen or what are you worried about with putting the child under sedation?

---

[1] Although definitions seem to vary, it is generally agreed Dandy Walker Syndrome ("DWS") describes a collection of brain malformations in the rear portion of the brain. Although there are several different malformations which may be associated with DWS, there appears to be a wide range of presentations in which a given patient may have anywhere from one to all of the associated abnormalities. The term Dandy Walker Variant is sometimes used as a catch-all term that describes lesser degrees of DWS, although it appears at other times that the terms Dandy Walker Syndrome and Dandy Walker Variant are used interchangeably.

4

> A. Do you have children?
> Q. Of course.
> A. I don't think I know any mother who doesn't worry when her child is being put under anesthesia. And there are things that happen. I mean, it's a low risk, but if a – some sort of medication reaction, some misplaced endotracheal tube. And so we tend to reserve those types of diagnostic studies for when we think it would make a difference in how we treat this child.

Id. at 49, l. 15 – 25. Dr. McLanahan went on to explain that the information obtainable from an MRI was not necessary in this case for the following reason: "[r]ight now I think considering the severity of his hydrocepalus initially most of what Marcus is exhibiting in terms of delay can be explained on that basis." Id. at 50. When it was revealed to Dr. McLanahan that the reason for all of these questions about an MRI was the possibility of this Motion, he responded, "I don't think under the circumstances that you described that it's justified for a patient to undergo general anesthesia unless his parents were to provide permission for that just to settle a legal dispute." Id.

Although Dr. Renfroe is unsure whether DWS could have caused the deficits Marcus now suffers, there is a consensus among Marcus's treating physicians and the Plaintiffs' retained experts that even if present, Dandy Walker Syndrome or variant is not the cause of Marcus's problems. When asked directly whether he had "any reason to believe that [Marcus'] impairments are related in any manner to Dandy Walker variant but not related to hydrocephalus," Dr. McLanahan responded, "I certainly do not have any evidence of that." Id. at 30. Further, when discussing the fact that he has seen several children with DWS who were "very normal," he stated, "I don't see a connection between his developmental delay and the Dandy Walker malformation." Id. at 33. Similarly, when asked about the defense that Marcus would have had the same outcome as a result of DWS even if shunted earlier, Dr. Gunter stated, "I disagree with that statement." Deposition Transcript of Dr. Gunter at 61, attached as Exhibit C to "Plaintiffs' Brief in Opposition ... "

(document #20). He went on to explain that he would have expected DWS extensive enough to cause the damages in this case to have been detected much earlier, even in utero. Id.

The Defendant's Motion has been briefed as set forth above and is, therefore, ripe for disposition.

## II. DISCUSSION

Rule 35 of the Federal Rules of Civil Procedures, entitled "Physical and Mental Examinations," provides:

> The court where the action is pending may order a party whose mental or physical condition--including blood group--is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner.

Fed. R. Civ. P. 35(a)(1). "The order may be made only on motion for good cause and on notice to all parties and the person to be examined." Fed. R. Civ. P. 35(a)(2). As the Fourth Circuit has stated,

> There appears to be adequate policy reasons for imposing the good cause requirement in Rules 34 and 35. Under Rule 35, the invasion of the individual's privacy by a physical or mental examination is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate.

Guilford National Bank of Greensboro v. Southern Railway Company, 297 F. 2d 921, 924 (4th Cir. 1962).

The Supreme Court has stated this standard requires

> an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination. Obviously, what may be good cause for one type of examination may not be so for another. The ability of the movant to obtain the desired information by other means is also relevant.

Schlagenhauf v. Holder, 379 U.S. 104, 118 (1964).

The parties have not cited, and the undersigned is unaware of, any other published Fourth Circuit authority concerning Rule 35 examinations generally, much less an examination of a four year-old child under general anesthesia. To the contrary, as Plaintiffs point out in their brief, a review of cases within the Fourth Circuit reveals that Rule 35 examinations typically consist of blood tests, DNA swabs, functional capacity evaluations, and mental/psychiatric examinations – examinations which are minimally invasive to the patient. See, e.g., French v. Wal-Mart Stores, Inc., 188 F.3d 501 (4th Cir. 1999) (unpublished) (noting that adult plaintiff had undergone Rule 35 physical examination of his lower back); Thompson v. Covenant Transport, Inc., 2008 WL 2329322 (W.D.N.C. 2008) (unpublished) (mental examination); McNeill v. Branker, 2008 WL 957447 (E.D.N.C. 2008) (unpublished) (same); Collins v. TIAA-CREF, 2008 WL 268446 (W.D.N.C. 2008) (unpublished) (same); and Dalton v. Premier Behavioral Solutions, Inc., 2006 WL 4759295 (E.D.N.C. 2006) (unpublished) (DNA test).

Defendants rely on Pena v. Troup, 163 F.R.D. 352 (D. Co. 1995), in which the District Court applied a burden-shifting approach to a proposed MRI of a child under general anesthesia. The Court required the party opposing the MRI to show that the proposed examination was prima facie potentially dangerous. Id. at 353. Once the non-movant made that initial showing, the burden shifted to the party seeking the examination to demonstrate the need for the examination and its safety. Id. In Pena, the Court found that while general anesthesia may be potentially dangerous, the defendant had met its burden of showing necessity and the minimal risk involved, and granted the motion for the examination. Id. at 356. As an initial matter, the Court notes, and the Defendant concedes in its brief, that the burden shifting approach used in Pena has never been applied by District Courts in the Fourth Circuit. Moreover, in Pena the child in question was at least 17 years-old (born in 1977,

7

MRI to be performed in 1995), there were no prior CT or other scans available, and three doctors testified that the MRI would provide vital information.

Rather than provide support for granting Defendant's Motion, the facts in Pena stand in stark contrast to those present here. While Pena involved a subject of nearly adult age, the Defendant proposes to perform an MRI under general anesthesia on a four year-old child in this case. More significantly, in Pena there were no other studies or scans available. In this case, the minor child has undergone seven CT scans and two cranial ultrasounds, all of which are available to the Defendant and its expert. Finally, while in Pena, three doctors opined that an MRI would provide vital information, in this case, all five doctors have opined that the proposed MRI will not determine the key causation issue – whether DWS, if present, would have caused the same deficits even had Marcus's hydrocephalus been diagnosed and treated earlier.

The Defendant has failed to establish good cause for the proposed examination and its Motion for a Rule 35 examination is denied. Accord Schlagenhauf, 379 U.S. at 118 ; and Guilford National Bank of Greensboro, 297 F. 2d at 924.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. "Defendant's Motion ... for MRI Examination of Marcus Whitaker ..." (document #16) is **DENIED**.

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties; and to the Honorable Robert J. Conrad, Jr.

**SO ORDERED**.

Signed: June 30, 2009

David S. Cayer
United States Magistrate Judge